## SOPHIE CIESIELSKI
### *vs.*
## THE WAGNER SERVICE, INC.

Superior Court        Hartford County        File No. 61424

MEMORANDUM FILED NOVEMBER 19, 1940.

*Birnbaum & Plocharczyk,* of New Britain, and *Hagearty, McDonough & Keefe,* of New Britain, for the Plaintiff.

*Halloran & Sage,* of Hartford, and *Joseph B. Hurwitz,* of Hartford, for the Defendant.

FOSTER, J.   The defendant operates a bus line in New

Britain as a carrier of passengers for hire. As such it owes a duty to its passengers to exercise the highest degree of care and skill which reasonably might be expected of intelligent and prudent persons engaged in such a business in view of the instrumentalities employed and the dangers to he apprehended. *Peck vs. Fanion,* 124 Conn. 549.

On February 8, 1939, about 4:50 p.m., the plaintiff was a passenger on one of the defendant's busses. The bus stopped near the curb and the sidewalk, and the plaintiff undertook to alight from the bus. She fell upon the sidewalk and suffered injuries. She does not claim that the defendant committed any overt act that caused her fall. She claims that her fall was caused by the slippery condition of the lowest step of the bus; that there was on that step an accumulation of pieces or chunks of snow and ice—of slush in a partly frozen condition: that in the exercise of due care she grasped railings at the side of the step, stood with both feet on the step, took one step off from the step with her right foot, and then that her left foot slipped on the slippery step of the bus, causing her to fall on the sidewalk.

The defendant denies that the step of the bus was slippery or had on it any snow, ice or slush. The defendant claims that the plaintiff fell on the sidewalk after she had taken two or three steps away from the bus. The two questions of fact in the case that are most controlling as to liability of the defendant are whether the plaintiff fell from the step of the bus or fell after both feet were on the sidewalk and, if she did fall from the step of the bus, whether such fall was caused by a slippery condition of the step of the bus.

The plaintiff testifies that the step was slippery and that she fell from it. She testifies that snow and ice and slush on the step were such as passengers would shake from their feet in boarding or alighting from the bus.

The bus stopped in front of a fire engine house. Two firemen, Davis and Brophy, testify that they were standing inside of that building looking out of a window in a door of the building; that there was on the step of the bus slush just freezing; that they saw the plaintiff fall from the step. Neither of them went outside of the building while the bus or the plaintiff were there.

The operator of the bus testifies that he operated the bus in

the early forenoon and took it back to the garage, which was heated; that he took the bus out at 4 p.m.; that when the plaintiff fell, the bus was loaded with passengers, who had stepped upon the step in question upon entering the bus; that there was snow upon the streets, but that the weather was clear and mild; that the step of the bus was of corrugated iron, was wet, had no snow, ice or slush upon it at 4:50 p.m.; that the plaintiff stepped off the step of the bus, took two or three steps on the sdewalk and then fell three or four feet away from the door of the bus.

Henry Rowe, a passenger on the bus, testified as follows:

"Q—Now where did you sit in that bus when you got on? A—Right back of the driver.

Q—On the same side as the driver?   A—Same side as the driver.

Q—Is there a hill there that goes down towards Main Street, down Myrtle Street?   A—Not where the bus stops here; just the other side of Curtis Street the hill starts.

Q—All right.   A—Well, this woman got out and she was a few feet from the bus diagonally; I remember she got out straight and she turned; she was about three feet from the bus when I see her turn her ankle.   The bus driver got out— she fell; the bus driver got out, and she was on her hands and knees.   He got hold of her arm, and I got out, heard her say "ice on the steps", and I looked at the steps, and there was no ice.

Q—You saw her when she fell?   A—Yes.

Q—Was she completely out of the bus at that time?   A—Yes.

Q—Had she taken some steps away from the bus?   A—Yes.

Q—Did you see her ankle turn?   A—Yes, I did.

Q—And you got up and got out of the bus?   A—I got out of the bus and was standing on the sidewalk.

Q—You heard her say something about ice on the steps? A—Yes.

Q—What did you do then?   A—I looked at the steps, saw the step was wet; I did not see any ice on it.

Q—Did not see any ice on it? A—No.

Q—Did you see any snow or slush on it? A—No.

Q—Just wet? A—Just wet."

Genevieve Rush, a passenger on the bus, testifies as follows:

"Q—Now will you tell His Honor in your own way, Mrs. Rush, what you saw happen after the bus came to a stop at Curtis and Myrtle Streets? A—Well, as the bus stopped that lady got up and the bus driver opened the door and she got out and she took about three steps and she went down on her hands and knees.

Q—You say she got out? A—Yes.

Q—You say she got out of the bus entirely? A—Yes, sir.

Q—You say you saw her take two or three steps? A—Yes, sir, I did.

Q—Was there anything that particularly drew your attention to this woman so that you watched her? A—Well, her clothes, her weight and her height and the shoes she wore.

Q—Did you notice the shoes that she had on? A—Yes, I have.

Q—What type of shoes were they? A—Well, she had on a very high heel.

Q—Did she have on rubbers or arctics so far as you know? A—No, sir.

Q—It was a little wet? A—Yes.

Q—Are you sure she was two or three steps away from the bus when you saw her fall? A—I am positive. Yes, I am.

Q—Was there anything at all on the steps at that time that you would notice? A—There was no ice or snow. It was wet, not much—but it was wet.

Q—What caused her to fall, did you see? A—I think them—

Q—Never mind what you think. What did you see that caused this lady to fall? A—Them high heels.

Q—Well, in what manner did you see the high heels cause her to fall? A—Well, they were very high.

Q—In what manner did you see those high heels cause her to fall? A—Well, if the heel is a little bit high—

Q—Never mind that—withdraw the question, and it will make it easier for both of us. Did you see her fall? A—That is true.

Q—Describe the fall from start to finish. A—Well, as the lady was getting off the bus she had a package in her hand, in this hand.

Q—In the left hand? A—Yes, sir; and she also had a purse or pocketbook, and she got off the bus and she took two or three steps and she went down on her hands and knees. She did not go down quick, just sort of, you know, like tripped and sank to the ground, you know.

Q—How many steps away from the bus was she when she tripped and fell? A—Oh, I should judge about three.

Q—You mean this step was absolutely clear? A—It was a little wet.

Q—No chunks of snow or ice gathered together? A—No, sir."

Anna Hiltpold, a passenger on the bus, testifies as follows:

"Q—Whether or not there was ice or snow or slush on the step of the bus when you got off? A—There was no ice on the bus nor slush on the step."

Margaret Barrett, a passenger on the bus, testifies as follows:

"Q—First let me ask you what were the weather conditions as you recall? A—It was a lovely day and it was thawed.

Q—Will you tell His Honor in your own way just what you saw this woman do? A—Well, I was sitting in the second seat and I was looking out the window; the woman got off and the first thing I saw she was down on her hands and knees.

Q—Was she off the bus at that time? A—Oh, completely.

Q—Completely off the bus? A—Yes.

Q—Did you observe the step when you got off? A—Yes.

Q—What was there on it? A—Nothing. It was wet. There was no ice or slush or anything of that kind.

Q—Did you happen to notice, Mrs. Barrett, the shoes the

woman was wearing? A—She had extremely high heels on, very high."

The official weather report in evidence shows that on the day in question the temperature at various hours was as follows:

| | | | |
|---|---|---|---|
| 9 | o'clock | 31 | degrees |
| 10 | o'clock | 34 | degrees |
| 11 | o'clock | 35 | degrees |
| 12 | o'clock | 37 | degrees |
| 1 | o'clock | 38 | degrees |
| 2 | o'clock | 38 | degrees |
| 3 | o'clock | 41 | degrees |
| 4 | o'clock | 40 | degrees |
| 5 | o'clock | 39 | degrees |

As the plaintiff appeared upon the witness stand she appeared to be short and fat, having short legs and small feet. Her own physician, Dr. Charles W. Goff, testifies in part as follows:

"She was essentially overweight. She had bilateral bunions. She had hypertrophic changes about the bones of her feet. She had the usual pressure signs due to bad shoes, and so forth."

Dr. Stephen P. Donnelly, called by the defendant, testifies in part as follows:

"Q—What did your examination disclose? A—Contusions of the foot and possible sprain of the ankle joint.

Q—Will you tell us briefly, just briefly review what your examination consisted of. A—Examination is that of a rather obese female complaining of pain and swelling of the left foot and ankle. The patient has a hallux valgus, or bunion, which is red and has a painful callous over it. There is also a large callous on the planta surface of the foot at the metatarsophalangeal joint, general relaxation of the longitudinal arch, and the patient walks with a definite left side limp."

If there was snow or ice or slush on the step of the bus, there is no evidence as to the length of time it had been there when the plaintiff fell. The plaintiff herself testifies that she did not observe any such condition when she boarded the bus.

"The bare description she gave of the ice, as a small patch three inches in diameter which felt hard when she stepped upon

it, in connection with the fact that many people had been getting on and off the car, would not permit an inference that the ice had been on the step any particular length of time; it might have been caused by the passengers who boarded the car at the preceding stop or have formed after that stop. The only basis of negligence would be that the driver in the course of the operation of the bus should have taken the precaution to examine the step just before she alighted and to see if there was ice upon it. Translated into terms of duty, this would mean that the driver was under an obligation at every stop the bus made to examine the step. Under the existing conditions this was too high a measure of care to impose upon the defendant." *Byrne vs. Connecticut Co.*, 123 Conn. 304, 306.

I find that the plaintiff has failed to prove by a fair preponderance of the evidence that the step was slippery at the time she fell. I find that the plaintiff fell on the sidewalk after she had taken two or three steps upon the sidewalk. The plaintiff, falling on the sidewalk so near to the bus, may have honestly thought that the cause of her fall was the slippery condition of the step of the bus. The two firemen undoubtedly had their attention called to the plaintiff by the fact of her fall upon the sidewalk, and, since her fall was so near to the entrance of the bus, they assumed erroneously that she fell from the step of the bus.

My opinion is that the plaintiff's fall upon the sidewalk was the result of her own physical structure and the height of the heels of the shoes she was wearing at the time she fell.

Judgment may be entered in favor of the defendant against the plaintiff.